## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| DENNIS WILLETTE, individually and on behalf of all others similarly situated,<br>    47 Buzzell Rd., Apt. 4<br>    Wells, Maine 04090<br>    York County, Maine<br><br>                    Plaintiff,<br>v.<br><br>INSIGHTIN HEALTH, INC.,<br>    333 W. Ostend St.<br>    Baltimore, Maryland 21230<br>    Baltimore County, Maryland<br><br>    and<br><br>MARTIN'S POINT HEALTH CARE,<br>    331 Veranda Street<br>    P.O. Box 9746<br>    Portland, Maine 04014<br>    Cumberland County, Maine<br><br>                    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Dennis Willette ("Plaintiff"), individually and on behalf of all similarly situated persons, alleges the following against Defendants Insightin Health, Inc. ("Insightin") and Martin's Point Health Care ("Martin's Point") (collectively, "Defendants"), based upon personal knowledge and on information and belief derived from, among other things, investigation by Plaintiff's counsel and review of public documents as to all other matters:

## INTRODUCTION

1.      Plaintiff brings this class action against Defendants for their failure to secure and safeguard Plaintiff's and other similarly situated current and former patients' and policyholders'

("Class Members") sensitive information, including protected health information ("PHI") and personally identifying information ("PII") (collectively, "PHI/PII" or "Private Information").

2.      Healthcare entities that handle PII and PHI owe a non-delegable duty to the individuals to whom that data relates. This duty arises because it is foreseeable that its exposure to unauthorized persons—especially to hackers with nefarious intentions—will result in harm to the individuals to whom the information relates.

3.      The harm resulting from a data breach manifests in a number of ways, including identity theft and financial or medical fraud. The exposure of a person's PII or PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take additional prophylactic measures.

4.      Defendant Insightin is a healthcare member engagement platform company, which supplies healthcare-related companies with algorithmic insights, analytics, and standardized recommendations. Insightin utilizes artificial intelligence and machine learning, which "allows healthcare payers to increase lifetime member value, drive growth, and improve overall plan profitability."[1]

5.      Defendant Martin's Point is a non-profit healthcare organization providing healthcare-related services and insurance plans. Martin's Point operates healthcare facilities in

_____

[1] Insightin Health, LINKEDIN, https://www.linkedin.com/company/insightin-health/ (last visited Feb. 4, 2026).

Maine and New Hampshire and is a client of Insightin.[2]

6.    Plaintiff and Class Members are current and former patients and policyholders of Defendants who provided their sensitive Private Information to Defendants as a necessary requirement for receiving healthcare-related services from Defendants.

7.    By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, Defendants assumed a resulting duty to secure, maintain, protect, and safeguard the Private Information with which they were entrusted against unauthorized access and disclosure through adequate security measures. Defendants are also aware that PII and PHI are highly valuable to cybercriminals, making it foreseeable that Defendants would be the target of a cyberattack.

8.    Despite Defendants' duty to safeguard the PII and PHI with which they were entrusted, as well as the foreseeability of a data breach, Plaintiff's and Class Members' Private Information stored by Defendants was accessed and acquired when Defendant Insightin experienced a cyber security incident in September 2025. Following an investigation, Insightin learned that its servers were accessed by an unauthorized party for six days between September 17 and September 23, 2025 (the "Data Breach").[3]  The exposed information included the sensitive Private Information of Defendant Martin's Point's current and former patients and policyholders.[4]

9.    In or around January 28, 2026, over four months after the Breach occurred, Defendant Insightin began notifying affected individuals, effectively giving cybercriminals a four-

---

[2] See Our Locations, MARTIN'S POINT, https://martinspoint.org/Primary-Care/See-Our-Locations (last visited Feb. 4, 2026).
[3] Notice of Data Privacy Event, INSIGHTIN HEALTH, https://insightinhealth.com/notice-of-data-event/ (last accessed Feb. 4, 2026).
[4] *Insighten Health Data Breach Exposes 378GB of PII and PHI*, CLAIM DEPOT (Jan. 30, 2026), https://www.claimdepot.com/data-breach/insightin-health-2026.

month headstart to exploit victims' stolen Private Information before the Data Breach they were on notice to protect and secure it.[5] To date, Defendant Martin's Point has yet to issue its own notice of the Data Breach.

10.     As a direct and proximate result of Defendants' failure to implement and follow basic, standard security procedures, Plaintiff's and Class Members' PII and PHI have been compromised by cybercriminals and disclosed to unauthorized persons. Plaintiff and Class Members have suffered harm and remain at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy, and similar forms of criminal activity—risks which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

11.     Defendants disregarded the rights of Plaintiff and Class Members by failing to implement and maintain adequate and reasonable measures to ensure that the Private Information of Plaintiff and Class Members was safeguarded, by failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow appropriate protocols, policies, and procedures regarding the encryption of data. As a result, the Private Information of Plaintiff and Class Members was compromised through disclosure to an unauthorized third party.

12.     Plaintiff brings this action on behalf of all persons whose Private Information was compromised as a result of Defendants' failures to: (i) adequately protect the Private Information of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendants' inadequate information security practices; (iii) effectively secure their networks containing protected Private

---

[5]    Notice of Security Incident, INSIGHTIN HEALTH (Jan. 28, 2026), https://ago.vermont.gov/sites/ago/files/documents/2026-01-28%20Insightin%20Health%20Data%20Breach%20Notice%20to%20Consumers.pdf.

Information using reasonable and effective security procedures free of vulnerabilities and incidents; and (iv) provide timely notice of the data breach to Plaintiff and Class Members. Defendants' conduct amounts to negligence and violates federal and state statutes.

13.    Plaintiff and Class Members have suffered injuries as a result of Defendants' conduct. These injuries include: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information. Plaintiff seeks to remedy these harms and prevent any future data compromise on behalf of Plaintiff and all similarly situated persons whose Private Information was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendants' inadequate data security practices.

14.    Plaintiff, individually and on behalf of the Class, bring claims against Defendants for negligence including negligence per se, breach of fiduciary duty, breach of implied contract, invasion of privacy, and unjust enrichment, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## **PARTIES**

15.    Plaintiff Dennis Willette is an adult individual and, at all relevant times herein, a resident and citizen of Wells, Maine. At all relevant times, Plaintiff was a policyholder of one of

Defendant Martin's Point health insurance plans.

16.    Defendant Insightin is incorporated in the State of Delaware and maintains its principal place of business at 333 West Ostend Street in Baltimore, Maryland 21230.

17.    Defendant Martin's Point is a non-profit healthcare and health insurance provider incorporated in the State of Maine, with its principal place of business at 331 Veranda Street in Portland, Maine 04013.

## JURISDICTION AND VENUE

18.    The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

19.    This Court has personal jurisdiction over Defendant Insightin because Insightin conducts business in Maryland and is a citizen of Maryland by virtue of maintaining its principal place of business in Maryland.

20.    This Court has personal jurisdiction over Defendant Martin's Point because it maintained Plaintiff's Private Information in Maryland and conducts substantial business in Maryland.

21.    Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant Insightin maintains its headquarters in this District, both Defendants regularly conducts business in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including Defendants' collection and/or storage of Plaintiff's and Class Members' Private Information.

## FACTUAL ALLEGATIONS

### A. *Defendants Collected and Stored Plaintiff's and Class Members' Private Information*

22.    Defendant Insightin is a large healthcare-related technology and information corporation headquartered in Baltimore, Maryland, which contracts with healthcare providers and insurers, such as Defendant Martin's Point, to provide them with services "[u]sing artificial intelligence and machine learning" which "produce insights … to solve pressing healthcare challenges." Insightin advertises its software-as-a-solution platform, inGAGE, as "the industry leading solution for improving experience and satisfaction," which "allows healthcare payers to increase lifetime member value, drive growth, and improve overall plan profitability."[6]

23.    Defendant Martin's Point is a non-profit healthcare system incorporated in the State of Maine. Martin's Point provides health insurance plans, as well as primary and specialty healthcare services at locations in Maine and New Hampshire.[7] In 2024, Martin's Point saw $550 million in revenue and $576 million in total revenue.[8] Martin's Point contracts with Insightin, which handles the sensitive Private Information of Martin's Point former and current patients and policyholders.

24.    Defendant Martin's Point requires new patients and policyholders to provide it with Private Information before it provides health insurance or treatment at its facilities, including names, addresses, dates of birth, Social Security numbers, health insurance information, as well as information regarding prior care, such as medical record numbers and treatment information, including diagnoses and dates and types of treatment. Defendant Insightin assists in maintaining

---

[6] About Insightin Health, LINKEDIN, https://www.linkedin.com/company/insightin-health/about/ (last visited Feb. 4, 2026).
[7] See Our Locations, MARTIN'S POINT, https://martinspoint.org/Primary-Care/See-Our-Locations (last visited Feb. 4, 2026).
[8]    Martin's    Point    Health    Care    Inc.,    PROPUBLICA, https://projects.propublica.org/nonprofits/organizations/10353275 (last visited Feb. 4, 2026).

this sensitive Private Information as part of the services it provides to Martin's Point.

25.    Defendants, during the regular course of business, receive, create, maintain, and handle Plaintiff's and Class Members' PII and PHI.

26.    Plaintiff and Class Members entrusted Defendants with their sensitive and confidential PII and PHI and, therefore, reasonably expected that Defendants would safeguard their highly sensitive PII and keep their PHI confidential.

27.    Due to the sensitivity of the PII and PHI that Defendants handle, collect, and store, Defendants were aware of their critical responsibility to safeguard this information—and, therefore, how devastating its theft is to individuals whose information has been stolen.

28.    By requesting, obtaining, collecting, storing, and deriving benefits from Plaintiff's and Class Members' PII and PHI, Defendants assumed equitable and legal duties to safeguard and keep confidential Plaintiff's and Class Members' highly sensitive Private Information, to only use this information for business purposes, and to only make authorized disclosures.

29.    Defendant Insightin's Health Privacy Statement acknowledges the importance of safeguarding PII and PHI, stating that it "values your privacy and the security of your information" including the information it "collect[s] … from and disclose[s] … back to [its] healthcare payer clients."[9]

30.    Defendant Martin's Point's Notice of Privacy Policies likewise acknowledges the importance of safeguarding its patients' and policyholders' PII and PHI, stating that it is "committed to protecting the privacy of health information [it] create[s] or obtain[s] about you," and that it "will notify you if your health information has been … used or disclosed in a way that

---

[9]    Insightin Health Privacy Statement, INSIGHTIN HEALTH (Apr. 23, 2025), https://insightinhealth.com/privacy-policy/.

is inconsistent with law and results in it being compromised."[10] Martin's Point has yet to notify its patients and policyholders of the Breach.

31.    Defendants both had affirmative duties to current and former patients and policyholders to ensure that their sensitive Private Information was properly safeguarded and secured. Moreover, Defendant Martin's Point had an affirmative duty in ensure it properly vetted its vendors, including Defendant Insightin, and that they were suitable to receive and be entrusted with Martin's Point's current and former patients' and policyholders' sensitive Private Information.

32.    Despite both Defendants' representations and the existences of their duties, Defendants failed to implement reasonable data security measures to protect Plaintiff's and Class Members' PII and PHI, ultimately allowing threat actors to compromise Plaintiff's and Class Members' Private Information.

33.    Defendant Martin's Point collected Plaintiff's and Class Members' PHI/PII and shared it, unencrypted, with Insightin, which then hosted the Private Information on its internet-accessible network as part of its normal business operations.

34.    Plaintiff and Class Members relied on the sophisticated Defendants to keep their PHI/PII confidential and securely maintained, to use this information for business and medical purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members demand security to safeguard their PHI/PII.

35.    Defendants had a duty to adopt reasonable measures to protect Plaintiff's and Class Members' PHI/PII from involuntary disclosure to unauthorized third parties.

---

[10] Notice of Privacy Practices for Martin's Point Health Plans and Health Care Providers, MARTIN'S POINT (last revised Dec. 17, 2025), https://martinspoint.org/-/media/Files/compliance/notice_of_privacy_practices.ashx.

36.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure and exfiltration.

**B.  The Risks of Storing Valuable PHI/PII Are Well Known in the Healthcare Industry**

37.     Given their frequent handling of sensitive data, Defendants were aware at all relevant times that the PII and PHI that they obtain, collect, store, use, and derive a benefit from is highly sensitive and is of significant value to those who seek to use it for wrongful purposes.

38.     Defendants also knew that a breach of their data systems, and the exposure of the information stored therein, would result in the imminent risk of identity theft and fraud for the individuals whose PII and PHI were compromised, as well as intrusion into their highly private health information.

39.     These risks are not theoretical; in recent years, data breaches at healthcare companies have become ubiquitous, with a new breach seemingly announced every few days.[11] The slew of healthcare data breaches over the last few years has surely put Defendants on notice that their electronic records will be targeted by cybercriminals.

40.     PII and PHI have considerable value and constitute enticing and well-known targets for hackers. Hackers can easily sell stolen data, as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[12] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

---

[11] *See generally* Steve Alder, *Healthcare Data Breach Statistics*, HIPAA Journal, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (Apr. 17, 2025).
[12] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

41.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the United States. In 2023, there were 6,077 recorded data breach incidents, exposing seventeen billion records. The United States specifically saw a 19.8% year-over-year increase in data breaches as compared to 2022.[13]

42.     In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[14]

43.     The healthcare industry in particular has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[15] Indeed, "[t]he IT environments of healthcare organizations are often complex and difficult to secure. Devices and software continue to be used that have reached end-of-life, as upgrading is costly and often problematic. Many healthcare providers use software solutions that have been developed to work on specific—and now obsolete—operating systems and cannot be transferred to supported operating systems."[16]

44.     Cybercriminals seek out PHI at a greater rate than other sources of personal information. Between 2009 and 2024, 6,759 healthcare data breaches of 500 or more individuals

---

[13]   *2024 Global Threat Intelligence Report*, Flashpoint (Feb. 29, 2024), https://go.flashpoint.io/2024-global-threat-intelligence-report-download.

[14]   *Insurance Information Institute, Facts & Statistics: Identity Theft and Cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited May 6, 2025).

[15]   *The Healthcare Industry is at Risk*, SwivelSecure https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited May 6, 2025).

[16]   Steve Alder, Editorial: *Why Do Criminals Target Medical Records*, HIPAA Journal (Oct. 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records.

have been reported to Health and Human Services' Office of Civil Rights. Those breaches have resulted in the exposure of 846,962,011 individuals, which equates to more than 2.6 times the population of the United States.[17]

45.     In fact, "[a]n unwanted record was set in 2023 with 725 large security breaches in healthcare reported to the Department of Health and Human Services Office for Civil Rights, beating the record of 720 healthcare security breaches set the previous year."[18] In 2023 alone, about one-third of Americans were affected by health-related data breaches.[19]

46.     "In 2024, the protected health information of 276,775,457 individuals was exposed or stolen. On average, that is 758,288 records per day[.]"[20]

47.     The breadth of data compromised in the Data Breach here makes the information particularly valuable to cybercriminals and leaves Plaintiff and Class Members vulnerable to medical fraud, identity theft, tax fraud, credit and bank fraud, and more.

48.     **Healthcare Records**—As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[21] A complete identity theft kit that includes health insurance

---

[17] *Krebs*, *supra* note 12.

[18] Steve Alder, *Security Breaches in Healthcare in 2023*, The HIPAA Journal (January 31, 2024), https://www.hipaajournal.com/wp-content/uploads/2024/01/Security_Breaches_In_Healthcare_in_2023_by_The_HIPAA_Journal.pdf.

[19] Ken Alltucker, *Health Care Data Breaches Hit 1 in 3 Americans Last Year: Is Your Data Vulnerable?*, USA Today (Feb. 19, 2024), https://www.usatoday.com/story/news/health/2024/02/18/health-data-breaches-hit-new-record-2023/72507651007/.

[20] *Krebs*, *supra* note 12.

[21] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, *New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[22]

49.    Indeed, medical records "are so valuable because they can be used to commit a multitude of crimes. Healthcare data can be used to impersonate patients to obtain expensive medical services, Medicare and Medicaid benefits, healthcare devices, and prescription medications. Healthcare records also contain the necessary information to allow fraudulent tax returns to be filed to obtain rebates."[23]

50.    "In contrast to credit card numbers and other financial information, healthcare data has an incredibly long lifespan and can often be misused for long periods undetected. Credit card companies monitor for fraud and rapidly block cards and accounts if suspicious activity is detected, but misuse of healthcare data is harder to identify and can be misused in many ways before any malicious activity is detected. During that time, criminals can run up huge debts—far more than is usually possible with stolen credit card information."[24]

51.    According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data [to] open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.

> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims

---

[22] *Managing Cyber Risks in an Interconnected World, Key Findings from The Global State of Information Security® Survey 2015*, PRICEWATERHOUSECOOPERS, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf (last visited Feb. 24, 2025).
[23] Adler, *supra* note 18.
[24] *Id.*

spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.

Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[25]

52.     Even if stolen PII and PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Indeed, even when cybercriminals do not gain access to a complete set of an individual's PII and PHI during a data breach, cybercriminals can cross-reference two or more sources of PII and PHI to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

53.     The development of Fullz packages means stolen PII from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

54.     Importantly, once a cybercriminal has a Fullz package, they can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take-overs,

---

[25] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, EXPERIAN (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

medical identity fraud, tax refund fraud, and buy now pay later frauds.[26] Most problematic, however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[27]

55.    Based on the value of individuals' PII and PHI to cybercriminals, and the foreseeability of a data breach, Defendants knew or should have known the importance of safeguarding the PII and PHI entrusted to them and of the foreseeable consequences that would arise if their data security systems were breached. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### C. Defendants Breached Their Duties to Protect PHI/PII

56.    As noted above, on or around January 28, 2026, Defendant Insightin announced that it had experienced a cybersecurity incident that led to unauthorized access to its computer systems in September 2025.[28]

57.    Despite discovering the Data Breach in September 2025, Defendant Insightin waited approximately three months to notify its clients, including Martin's Point, and four months to publicly announce the Breach. Defendant Martin's Point has yet to issue any sort of notice regarding the Data Breach.

58.    Insightin's Notice describes the circumstances surrounding the Data Breach as follows:

> In September 2025, Insightin identified suspicious activity within its

---

[26] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Mar. 3, 2024), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.
[27] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.
[28] Notice of Security Incident, INSIGHTIN HEALTH (Jan. 28, 2026), https://ago.vermont.gov/sites/ago/files/documents/2026-01-28%20Insightin%20Health%20Data%20Breach%20Notice%20to%20Consumers.pdf.

networked environment after an unauthorized actor gained access to the Insightin network by exploiting a previously unknown vulnerability in a third-party application. In response, Insightin launched an investigation with the assistance of third-party forensic specialists into the nature and scope of this potential incident. Insightin determined that certain files stored on a limited number of Insightin servers may have been accessed or copied by an unauthorized party between September 17, 2025 and September 23, 2025. As a result, Insightin remediated to prevent the potential for ongoing access and began a comprehensive review of these files to determine whether sensitive information may be impacted, and whom that information belonged to. That investigation completed recently, and between December 4, 2025 and December 18, 2025, Insightin provided information related to this incident to its clients, including Martin's Point Health Care. Insightin then worked with its clients to compile and finalize lists of potentially impacted individuals.[29]

59.    According to Insightin, the compromised data includes patient and policyholder "health plan information, contact information, date of birth, and gender."[30]

60.    Notably absent from Insightin's Notice are the specifics of how its data systems were compromised, as well as the identity of the threat actor(s) who carried out the hack, which, upon information and belief, Insightin had knowledge of.

61.    In fact, shortly after Insightin discovered the Data Breach, on September 26, 2025, the notorious ransomware group MEDUSA claimed responsibility for the cyber-attack, asserting that it had obtained 378 GB of data from Insightin, and threatened to publish that data if MEDUSA's demands were not met:[31]

---

[29] *Id.*
[30] *Id.*
[31] *Insightin Health Data Breach Exposes 378GB of PII and PHI*, CLAIMS DEPOT (Jan. 30, 2026), https://www.claimdepot.com/data-breach/insightin-health-2026.



62.    Defendants' failure to issue a timely notice of the Data Breach as well as their failure to include relevant and specific details about the Data Breach, including the fact that Defendants' patients' and policyholders' sensitive Private Information had been held for ransom by a notorious cybercriminal group, further harmed Plaintiff and Class Members by depriving them of a chance to mitigate their potential damages.

63.    Defendants were, or should have been, fully aware of the unique type and significant volume of sensitive data on Defendants' network servers and systems, and the significant number of individuals who would be harmed by the exposure of that unencrypted data.

64.    Plaintiff and Class Members were the foreseeable and probable victims of Defendants' inadequate security practices and procedures. Defendants knew or should have known of the inherent risks of collecting and storing PHI/PII and the critical importance of providing adequate security for that data, particularly due to the highly public trend of data breach incidents in the healthcare industry in recent years.

65.     As a direct and proximate result of Defendants' failure to implement and maintain adequate security measures, Plaintiff's and Class Members' PII and PHI were exposed to unknown, malicious actors during the Data Breach. It will be nearly impossible for Plaintiff and the Class to ensure that their stolen PII and PHI have been secured and not further disseminated.

### D.  Defendants Failed to Comply with HIPAA Requirements

66.     Defendants are covered business associates under HIPAA (45 C.F.R. § 160.102) and are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

67.     Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[32] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

68.     HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

69.     HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

70.     HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

---

[32] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

71.     "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

72.     HIPAA's Security Rule requires Defendants to do the following:

   a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associates create, receive, maintain, or transmit;

   b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

   c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

   d. Ensure compliance by their respective workforces.

73.     HIPAA also requires Defendants to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e).

74.     Additionally, Defendants are required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

75.     HIPAA and HITECH also obligated Defendnats to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not

permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

76.     The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendants to provide notice of the Data Breach to each affected individual "*without unreasonable delay and in no case later than 60 days following discovery of the breach*."[33]

77.     HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

78.     HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

79.     HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost-effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." U.S. Department of Health & Human Services, Security Rule Guidance

---

[33] *Breach Notification Rule*, U.S. Department of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last accessed on May 21, 2024) (emphasis added).

Material.[34] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." U.S. Department of Health & Human Services, Guidance on Risk Analysis.[35]

### E. Defendants Failed to Comply with FTC Guidelines

80.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

81.    In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[36] The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion

---

[34] *Security Rule Guidance Material*, U.S. Department of Health & Human Services, http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last accessed on May 21, 2024).
[35] *Guidance on Risk Analysis*, U.S. Department of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last accessed on May 21, 2024).
[36] *Protecting Personal Information: A Guide for Business,* FED. TRADE COMM'N (October 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited on Nov. 14, 2025).

detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

82.    The FTC further recommends that companies not maintain personally identifiable information ("PII") longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

83.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45 *et seq*. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

84.    Such FTC enforcement actions include those against businesses that fail to adequately protect customer data, like Defendants here. *See, e.g.*, *In the Matter of LabMD, Inc*., 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

85.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendants of failing to use reasonable measures to protect Private Information they collect and maintain from consumers. The FTC publications and orders described above also

form part of the basis of Defendants' duty in this regard.

86.     The FTC has also recognized that personal data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[37]

87.     As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

88.     Defendants were at all times fully aware of their obligations to protect the Private Information of their patients and policyholders yet failed to comply with such obligations. Defendants were also aware of the significant repercussions that would result from their failure to do so.

### F.  *Defendants Failed to Comply with Industry Standards*

89.     As noted above, experts studying cybersecurity routinely identify businesses such as Defendants' as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

90.     The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and

---

[37] FTC Commissioner Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable* (Dec. 7, 2009), FED. TRADE COMM'N, *transcript available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited on Nov. 14, 2025).

Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[38]

91.     The National Institute of Standards and Technology ("NIST") also recommends certain practices to safeguard systems, such as the following:

   a. Control who logs on to your network and uses your computers and other devices.
   b. Use security software to protect data.
   c. Encrypt sensitive data, at rest and in transit.
   d. Conduct regular backups of data.
   e. Update security software regularly, automating those updates if possible.
   f. Have formal policies for safely disposing of electronic files and old devices.
   g. Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

92.     Further still, the United States Cybersecurity and Infrastructure Security Agency ("CISA") makes specific recommendations to organizations to guard against cybersecurity attacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is  to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT

---

[38] *The 18 CIS Critical Security Controls*, CTR. FOR INTERNET SEC., https://www.cisecurity.org/controls/cis-controls-list (last visited on Nov. 14, 2025).

personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[39]

93.    Defendants failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

### G. Defendants Breached Their Duties to Safeguard Plaintiff's and Class Members' Private Information

94.    In addition to its obligations under federal and state laws, Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiff and Class Members to provide reasonable security, including complying with industry standards and requirements, training for their staff, and ensuring that their computer systems, networks, and protocols adequately protected the Private Information of Class Members.

---

[39] *Shields Up: Guidance for Organizations*, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY, https://www.cisa.gov/shields-guidance-organizations (last visited Nov. 14, 2025).

95.     Defendants breached their obligations to Plaintiff and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.   Failing to ensure maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b.   Failing to adequately protects patients' and policyholders' Private Information;

c.   Failing to monitor their own data security systems for existing intrusions;

d.   Failing to sufficiently train their employees regarding the proper handling of patients' and policyholders' Private Information;

e.   Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

f.   Failing to adhere to industry standards for cybersecurity as discussed above; and

g.   Otherwise breaching their duties and obligations to protect Plaintiff's and Class Members' Private Information.

96.     Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access computer networks and systems which contained unsecured and unencrypted Private Information.

97.     Had Defendants remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, they could have prevented intrusion into their information storage and security systems holding Plaintiff's and the Class's confidential Private Information and, ultimately, the theft of that confidential Private Information.

26

98.     Accordingly, Plaintiff's and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiff and Class Members also lost the benefit of the bargain they made with Defendants.

### H.  Plaintiff and Class Members suffered Damages

99.     For the reasons mentioned above, Defendants' conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways. Plaintiff and Class Members have already been caused to and must continue to devote time, energy, and money to: (1) closely monitor their medical statements, bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

100.    Once PII and PHI are exposed, there is virtually no way to ensure that the exposed information has been fully recovered or protected against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly for their entire lives, as a result of Defendants' conduct. Further, the value of Plaintiff's and Class Members' PII and PHI has been greatly diminished by their exposure in the Data Breach.

101.    As a result of Defendants' failures, Plaintiff and Class Members are also at a substantially increased risk of identity theft, fraud, phishing attacks, and related cybercrimes following the Data Breach. Those who are affected experience heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

102.     With respect to data breaches specifically in the healthcare sector, a study has found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[40]

103.     "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[41]

104.     The reality is that cybercriminals seek nefarious outcomes from a data breach, and "stolen health data can be used to carry out a variety of crimes."[42]

105.     Health information in particular is likely to be used in detrimental ways. Cybercriminals can leverage sensitive personal health details and diagnoses to extort or coerce the victim and commit serious and long-term identity theft.[43]

106.     "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[44]

---

[40] Jessica David, *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, HEALTH IT SEC. (Sept. 25, 2019), https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud.
[41] *Id.*
[42] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.
[43] *Id.*
[44] *The Potential Damages & Consequences of Medical Identity Theft & Healthcare Data Breaches*, EXPERIAN (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

107.    Indeed, many victims of medical identity theft are not aware of the theft until long after it occurs; "[s]omeone may apply for a mortgage, for example, and learn their credit is ruined due to unpaid medical bills for care they didn't receive."[45]

108.    Plaintiff and Class Members are at continued risk because their information remains in Defendants' systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendants fail to undertake the necessary and appropriate security and training measures to protect the PII and PHI with which they were entrusted.

109.    Additionally, Plaintiff and Class Members have suffered emotional distress, increased risk of identity theft and financial fraud, and the unauthorized exposure of their sensitive Private Information to cybercriminals as a result of the Data Breach.

## PLAINTIFF'S AND CLASS MEMBER'S DAMAGES

### Plaintiff Dennis Willette's Experience

110.    Plaintiff Dennis Willette is a current policyholder of one of Defendant Martin's Point's insurance plans and has been for approximately the last three years.

111.    As a result of the Data Breach, on information and belief, Plaintiff's sensitive information was accessed and/or acquired by an unauthorized actor. The confidentiality of Plaintiff's sensitive Private Information has been irreparably harmed. For the rest of his life, Plaintiff will have to worry about when and how his sensitive information may be shared or used to his detriment.

112.    As a result of the Data Breach, Plaintiff has spent time dealing with its

---

[45] Michelle Andrews, *Someone Could Steal Your Medical Records and Bill You for Their Care*, NPR (July 26, 2023), https://www.npr.org/sections/health-shots/2023/07/26/1189831369/medical-identity-fraud-protect-yourself.

consequences, which includes time spent reporting a fraudulent attempt to take out a loan in his name. This time has been lost forever and cannot be recaptured.

113.    Since the Data Breach, Plaintiff Willette has experienced attempted fraud. Specifically, in or around late January of 2026, Plaintiff Willette learned that an unidentified individual attempted to take a loan out in Willette's name. This attempted fraud damaged Plaintiff Willette by, among other things, negatively impacting his credit store and causing him to spend time contacting the creditor which performed the credit check.

114.    Since the Data Breach, Plaintiff has tried to mitigate the damage by contacting credit companies and monitoring financial accounts for fraud on a daily basis, and has spent and will continue to spend hours on these activities. This is more time than Plaintiff spent prior to learning of the Data Breach. Having to do this every day not only wastes time, but it also causes anxiety.

115.    Additionally, Plaintiff is very careful about sharing his sensitive Private Information. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

116.    Plaintiff stores any documents containing his sensitive Private Information in a safe and secure designated location. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

117.    Defendants' failure to recognize their data security shortcomings resulted in the Data Breach and caused Plaintiff significant injuries and harm in several ways. For example, Plaintiff has devoted and will continue to devote significant time, energy, and money to: closely monitoring his bills, records, and credit and financial accounts; changing login and password information on any sensitive account; carefully screening and scrutinizing phone calls, emails, and

other communications to ensure that he is not being targeted by identity theft scams, medical identity theft scams, or other attempts at fraud; searching for suitable identity theft protection and credit monitoring services and paying for such services to protect himself; and placing fraud alerts and/or credit freezes on their credit file. Plaintiff has taken or will be forced to take these measures to mitigate his potential damages because of the Data Breach.

118.    In addition to the attempted fraud already suffered, Plaintiff has also suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, medical identity theft, and misuse resulting from his Private Information being placed in the hands of criminals. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

119.    Plaintiff has experienced anxiety and increased concerns arising from the fact that his Private Information has already been misused and may be misused again in the future, and from the loss of his privacy.

120.    The risk is not hypothetical. Here, a known hacker group intentionally stole the data, misused it, and threatened to publish or has published it on the Dark Web, and the sensitive Private Information is the type that could be used to perpetrate identity theft or fraud. Moreover, Plaintiff Willette has already experienced attempted identity theft in the form of an unauthorized person attempting to take out a loan in his name.

121.    Plaintiff further suffered actual injury in the form of damages to and diminution in the value of Plaintiff's Private Information, a form of intangible property that Plaintiff entrusted to Defendants, which was compromised in and because of the Data Breach. Future identity theft monitoring is reasonable and necessary, and such will include future costs and expenses.

122.    Plaintiff has a continuing interest in ensuring that his Private Information, which,

upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

123.    Had Plaintiff Willette been aware that Defendants' computer systems were not secure, he would not have entrusted Defendants with his Private Information.

*Plaintiff's and Class Members' Common Injuries*

124.    Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

125.    Plaintiff and Class Members entrusted their Private Information to Defendants in order to receive Defendants' services.

126.    Plaintiff's Private Information was subsequently compromised as a direct and proximate result of the Data Breach.

127.    As a direct and proximate result of Defendants' failure to properly safeguard and secure their network systems, Plaintiff and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having medical services billed in their names, loans and credit lines opened in their names, tax returns filed in their names, utility bills opened in their names, credit card accounts opened in their names, and other forms of identity theft.

128.    Further, as a direct and proximate result of Defendants' data security failings, Plaintiff and Class Members have been forced to spend time dealing with the effects of the Data Breach.

129.    Plaintiff and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to carry out such targeted

schemes against Plaintiff and Class Members.

130.    The Private Information maintained by and stolen from Defendants' systems, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiff and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiff and Class Members.

131.    Plaintiff and Class Members also lost the benefit of the bargain they made with Defendants. Plaintiff and Class Members overpaid for services that were intended to be accompanied by adequate data security but were not. Indeed, part of the price Plaintiff and Class Members paid to Defendants was intended to be used by Defendants to fund adequate security of Plaintiff's and Class Members' Private Information. Thus, Plaintiff and the Class did not receive what they paid for.

132.    Additionally, as a direct and proximate result of Defendants' data security failings, Plaintiff and Class Members have also been forced to take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

133.    Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

134.    Additionally, Plaintiff and Class Members suffered a loss of value of their PHI/PII when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust legitimate marketplace

for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[46] In fact, consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[47]

135.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is apparently readily available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiff and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiff and the Class Members, thereby causing additional loss of value.

136.    Plaintiff and Class Members were also damaged via benefit-of-the-bargain damages. The contractual bargain entered into between Plaintiff and Defendants included Defendants' contractual obligation to provide adequate data security, which Defendants failed to provide. Thus, Plaintiff and Class Members did not get what they bargained for.

137.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to still be in Defendants' possession, is protected from future additional breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing

---

[46] *See How Data Brokers Profit from the Data We Create*, THE QUANTUM RECORD, https://thequantumrecord.com/blog/data-brokers-profit-from-our-data/ (last visited on November 14, 2025).
[47] *Frequently Asked Questions,* NIELSEN COMPUTER & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited on November 14, 2025).

personal and financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

138.    As a direct and proximate result of Defendants' actions and inactions, Plaintiff and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## CLASS ACTION ALLEGATIONS

139.    Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of the following class:

> All individuals who are residents of the United States whose PII and/or PHI were compromised in the Data Breach, including all persons who received notice of the Data Breach.

140.    Excluded from the Class are Defendants and their parents or subsidiaries, any entities in which a Defendant has a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

141.    Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

142.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

143.    **Numerosity.** The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of thousands of Defendants' current and former patients and policyholders whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through Defendants' books and records.

144. **Commonality**. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a. Whether and to what extent Defendants had a duty to protect the PII and PHI of Plaintiff and Class Members;

    b. Whether Defendants were negligent in collecting and storing Plaintiff's and Class Members' PII and PHI, and breached their duties thereby;

    c. Whether Defendants took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII and PHI;

    d. Whether Defendants failed to adequately safeguard Plaintiff's and Class Members' PII and PHI;

    e. Whether Defendants breached their duty to exercise reasonable care in handling Plaintiff's and Class Members' PII and PHI;

    f. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    g. Whether Plaintiff and Class Members are entitled to damages as a result of Defendants' wrongful conduct; and

    h. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

145. **Typicality**. Plaintiff's claims are typical of the claims of Class Members. Plaintiff's and Class Members' claims are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and Class Members each had their PII and PHI exposed and/or

accessed by an unauthorized third party.

146. **Adequacy.** Plaintiff is an adequate representative of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the Class Members and has no interests antagonistic to the interests of the Class Members. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical, as explained above.

147. **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages are common to Plaintiff and each Member of the Class. If Defendants breached their duty to Plaintiff and Class Members, then Plaintiff and each Class Member suffered damages by that conduct.

148. **Superiority.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy, and joinder of all Class Members is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

149. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Defendants have acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

## CAUSES OF ACTION
### COUNT I
### NEGLIGENCE & NEGLIGENCE PER SE

150.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

151.    Defendants owed a non-delegable duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting PII and PHI relating to Plaintiff and the Class in Defendants' possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

152.    Specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendants' security systems to ensure that Plaintiff's and Class Members' PII and PHI in Defendants' possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security systems in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

153.    Defendants' duty to use reasonable care arose from several sources, including but not limited to those identified below.

154.    Defendants had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendants. By receiving, maintaining, and handling PII and PHI that are routinely targeted by criminals for unauthorized access, Defendants were obligated to act with reasonable care to protect against these foreseeable threats. Defendants alone controlled their own technology, infrastructure, and cybersecurity. Defendants further knew or should have known that if hackers breached their data systems, they would extract sensitive data

and inflict injury upon Plaintiff and Class Members. Furthermore, Defendants knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen. Therefore, the Data Breach, and the harm it caused Plaintiff and Class Members, was the foreseeable consequence of Defendants' unsecure and unreasonable data security measures.

155.    Defendants also owed a common law duty because their conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendants' conduct included their failure to adequately restrict access to its computer networks that held Plaintiff's and Class Members' PII and PHI.

156.    Defendants' duty also arose from their position as healthcare-related businesses. Defendants hold themselves out as a trusted business associates and trusted providers of healthcare and healthcare-related services, thereby assuming a duty to reasonably protect the information they obtain from patients and policyholders. Indeed, Defendants, which receive, maintain, and handle the PII and PHI with which they were entrusted, were in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

157.    Defendants are subject to an "independent duty," untethered to any contract between Defendants and Plaintiff and Defendants and Class Members. The sources of Defendants' duties are identified above.

158.    Defendants breached the duties owed to Plaintiff and Class Members and thus were negligent. Although the exact methodologies employed by the unauthorized third parties are unknown to Plaintiff at this time, on information and belief, Defendants breached their duties through some combination of the following errors and omissions that allowed the Data Breach to occur: (a) mismanaging their systems and failing to identify reasonably foreseeable internal and

external risks to the security, confidentiality, and integrity of patient and member information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling their data security by failing to assess the sufficiency of their safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards, key controls, systems, and procedures; (e) failing to evaluate and adjust their information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; and (g) failing to adequately train and supervise employees with access or credentials to systems and databases containing sensitive PII and PHI.

159. But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class Members, their PII and PHI would not have been accessed and compromised by cybercriminals.

160. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered injuries including:

    a. Theft of their PII and PHI;

    b. Costs associated with requesting credit freezes;

    c. Costs associated with the detection and prevention of identity theft;

    d. Costs associated with purchasing credit monitoring and identity theft protection services;

    e. Lowered credit scores resulting from credit inquiries following fraudulent activities;

f.  Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

g.  The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII and PHI being placed in the hands of criminals;

h.  Damages to and diminution in value of their PII and PHI entrusted to Defendants with the mutual understanding that Defendants would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others; and

i.  Continued risk of exposure to hackers and thieves of their PII and PHI, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff and Class Members.

161.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

162.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and their patients and policyholders, which is recognized by laws and regulations, as well as common law. Defendants were in a position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members from a Data Breach.

163.    Defendants' duties also arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164,

Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

164.    Defendants' duties additionally arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to employ reasonable measures to protect and secure Private Information.

165.    Defendants' duties further arise from the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. § 1302(d), *et seq.*

166.    Defendants are entity covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

167.    Defendants violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtain and store, and the foreseeable consequences of a data breach involving Private Information including, specifically, the substantial damages that would result to Plaintiff and Class Members.

168.    Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

169.    Plaintiff and Class Members are within the class of persons that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

170.    The harm occurring as a result of the Data Breach is the type of harm the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against.

171.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class Members' Private Information to unauthorized individuals.

172.    The injury and harm that Plaintiff and Class Members suffered was the direct and proximate result of Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiff and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their Private Information; (iii) breach of the confidentiality of their Private Information; (iv) deprivation of the value of their Private Information, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vi) actual or attempted fraud.

## COUNT II
## BREACH OF FIDUCIARY DUTY

173.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

174.    Plaintiff and Class Members have an interest, both equitable and legal, in the PII and PHI that was conveyed to, collected by, and maintained by Defendants and that was ultimately accessed or compromised in the Data Breach.

175.    As healthcare entities, Defendants have a fiduciary relationship to their patients and policyholders. By providing health insurance and healthcare services for Plaintiff and the Class, Defendants have a duty to act in good faith and solely for the benefit of Plaintiff and Class Members in all matters related to their healthcare.

176.    Defendants are in possession of individuals' PII, PHI, and confidential medical information that are not generally known. Plaintiff is very careful with PII and PHI and does not disclose PII/PHI of Plaintiff's own accord.

177.    Plaintiff and Class Members neither consented to nor authorized the disclosure of their PII/PHI to a criminal actor.

178.    Defendants were negligent in the maintenance of their computer systems in which Plaintiff's and Class Members' PII and PHI were stored. Defendants knew, or should have known, that the Private Information stored in their systems could be exploited at great cost to Plaintiff and the Class.

179.    Plaintiff has suffered concrete injuries as a result of Plaintiff's PII and PHI being exposed in the Data Breach.

180.    Plaintiff has dedicated significant time to monitoring financial accounts, implementing credit freezes, registering for identity theft protection, and dealing with increased spam communications. As discussed *supra*, cybercriminals may store individuals' PII and PHI for years before using it for fraudulent activity. After Insightin's offer of credit monitoring expires, any credit monitoring services that Plaintiff requires must be purchased out of pocket. Due to the breadth of Private Information compromised in the Data Breach, Plaintiff may need credit monitoring services for the rest of Plaintiff's life.

181.    Beyond the impending risk of identity or medical fraud, Plaintiff and Class Members have suffered emotional distress from the exposure of their private medical information.

182.    Further, Plaintiff and Class Members have suffered damage to and diminution of the value of their PII and PHI. Individual pieces of private information have an ascertainable monetary value, as evidenced by the prices cybercriminals charge for them.

183.    As healthcare entities, Defendants breached their fiduciary duty to patients and policyholders by, among other things: (a) mismanaging their system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of patient information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling their data security by failing to assess the sufficiency of their safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust their information security program in light of the circumstances alleged herein; (f) failing to follow their own privacy policies and practices; and (g) making an unauthorized and unjustified disclosure and release of Plaintiff and the Class Members' PHI and medical records/information to a criminal third party.

184.    Defendants' breach of their fiduciary duty to their patients and policyholders was a real factor in bringing about Plaintiff's and Class Members' injuries. But for Defendants' failure to properly secure their computer systems, Plaintiff would not be required to spend time, money, and effort to protect themselves from imminent fraud.

185.    In addition to Defendants' duty to keep Plaintiff's and Class Member's Private Information confidential, Defendants failed to safeguard PII and PHI that Plaintiff and the Class had no choice but to provide to receive medical treatment and/or health insurance. Plaintiff and

the Class were reliant on Defendants for necessary services. The imbalance of power between Plaintiff and Defendants further indicates that Defendants owed, and subsequently breached, a fiduciary duty to their patients and policyholders.

186.    As a direct and proximate result of Defendants' breach of their fiduciary duty, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**

187.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

188.    In connection with receiving healthcare treatment or services, Plaintiff and all other Class Members entered into implied contracts with Defendants.

189.    Pursuant to these implied contracts, Plaintiff and Class Members paid money to Defendants, whether directly or through their insurers, and provided Defendants with their PII/PHI. In exchange, Defendants agreed to, among other things, and Plaintiff understood that Defendants would: (1) provide medical treatment, services, or health plan benefits to Plaintiff and Class Members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class Members' PII/PHI; and (3) protect Plaintiff's and Class Members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

190.    The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class Members, on the one hand, and Defendants, on the other hand. Indeed, as set forth *supra*, Defendants recognized the importance of data security and the privacy of their patients' and policyholders' PII/PHI in their respective privacy policies. Had Plaintiff and Class Members known that Defendants would not adequately protect their patients' and

policyholders' PII/PHI, they would not have received medical treatment or services from Defendants.

191.    Plaintiff and Class Members performed their obligations under the implied contract when they provided Defendants with their PII/PHI and paid—directly or through their insurers—for health care treatment, services, or health insurance premiums from Defendants.

192.    Defendants breached their obligations under their implied contracts with Plaintiff and Class Members by failing to implement and maintain reasonable security measures, protocols, and procedures to protect and secure Plaintiff's and Class Members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

193.    Defendants' breach of their obligations of their implied contracts with Plaintiff and Class Members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class Members have suffered from the Data Breach.

194.    Plaintiff and all other Class Members were damaged by Defendants' breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; and/or (vi) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

**COUNT IV**
**UNJUST ENRICHMENT**

195.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

196.    This claim is pleaded in the alternative to Plaintiff's current and future contract-based claims.

197.    By their wrongful acts and omissions described herein, Defendants have obtained an undue benefit from the PII and PHI entrusted to them by Plaintiff and Class Members.

198.    Defendants were aware of, appreciated, and/or understood the undue benefit they obtained from their transactions with Plaintiff and Class Members.

199.    Defendants, prior to and at the time Plaintiff and Class Members entrusted their PHI/PII to Defendants for the purpose of obtaining health services, caused Plaintiff and Class Members to reasonably believe that Defendants would keep such PHI/PII secure.

200.    Defendants were aware, or should have been aware, that Plaintiff and Class Members relied on their representations that the PHI/PII kept in their custody would be secure. Plaintiff and Class Members would not have contracted with Defendants had they known that Defendants' information systems were sub-standard for that purpose.

201.    Defendants also knew or should have known that if Plaintiff and Class Members became aware of the substandard condition of and vulnerabilities in Defendnats' information systems, Plaintiff and Class Members would be much less likely to seek their services.

202.    Defendants failed to disclose facts pertaining to their substandard information systems before Plaintiff and Class Members made their decisions to seek medical care. Instead, Defendants suppressed and concealed such information for months after the Data Breach occurred. By concealing and suppressing that information, Defendants denied Plaintiff and Class Members the ability to make informed decisions regarding their PHI and PII and received an undue benefit.

203.    Defendants were unjustly enriched at the expense of Plaintiff and Class Members. Defendants received profits, benefits, and compensation, in part, at the expense of Plaintiff and Class Members. By contrast, Plaintiff and Class Members did not receive the benefit of their bargain because they sought healthcare services on the assumption that their Private Information would be secure in Defendants' possession.

204.    Since Defendants' profits, benefits, and other compensation were obtained by improper means, Defendants are not legally or equitably entitled to retain any of the benefits, compensation or profits they realized from these transactions.

205.    Plaintiff and Class Members seek an Order of this Court requiring Defendants to refund, disgorge, and pay as restitution any profits, benefits and other compensation obtained by Defendants from their wrongful conduct and/or the establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

## COUNT V
## INVASION OF PRIVACY (INTRUSION UPON SECLUSION)

206.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

207.    Plaintiff and Class Members had a reasonable expectation of privacy in the Private Information that Defendants disclosed without authorization.

208.    By failing to keep Plaintiff's and Class Members' Private Information safe, knowingly employing inadequate data privacy policies and protocols, and disclosing Private Information to unauthorized parties for unauthorized use, Defendants unlawfully invaded Plaintiff's and Class Members' privacy by, *inter alia*:

    a.    intruding into Plaintiff's and Class Members' private affairs in a manner that would be highly offensive to a reasonable person; and

b. invading Plaintiff's and Class Members' privacy by improperly using their Private Information properly obtained for a specific purpose for another purpose, or disclosing it to some third party;

c. failing to adequately secure Private Information from disclosure to unauthorized persons; and

d. enabling the disclosure of Plaintiff's and Class Members' Private Information without consent.

209. Defendants knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiff's and Class Members' position would consider their actions highly offensive.

210. Defendants knew that their IT systems and servers were vulnerable to data breaches prior to the Data Breach.

211. Defendants invaded Plaintiff's and Class Members' right to privacy and intruded into Plaintiff's and Class Members' private affairs by disclosing their Private Information to unauthorized persons without their informed, voluntary, affirmative, and clear consent.

212. As a proximate result of such unauthorized disclosures, Plaintiff's and Class Members' reasonable expectations of privacy in their Private Information was unduly frustrated and thwarted. Defendants' conduct amounted to a serious invasion of Plaintiff's and Class Members' protected privacy interests.

213. In failing to protect Plaintiff's and Class Members' Private Information, and in disclosing Plaintiff's and Class Members' Private Information, Defendants acted with malice and oppression and in conscious disregard of Plaintiff's and Class Members' rights to have such information kept confidential and private.

50

214.    Plaintiff seeks injunctive relief on behalf of the Class, restitution, and all other damages available under this Count.

## COUNT VI
## DECLARATORY JUDGMENT

215.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

216.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Class Action Complaint.

217.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and PHI. Namely, whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII and PHI. Plaintiff alleges that Defendants' data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of their PII and PHI and remain at imminent risk that further compromises of their PII/PHI will occur in the future.

218.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that, among other things:

a.    Defendants owed a legal duty to secure their patients' and policyholders' PII and PHI under common law, HIPAA, and Section 5 of the FTC Act; and

b.    Defendants breached and continues to breach these legal duties by failing to employ reasonable measures to secure their patients' and policyholders' PII and PHI.

219.     This Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect Plaintiff's and Class Members' PII and PHI.

220.     If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach of Defendants' systems. The risk of another such breach is real, immediate, and substantial. If another breach of any of Defendants' systems occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

221.     The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have pre-existing legal obligations to employ such measures.

222.     Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach of Defendants' systems, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and patients and policyholders whose confidential Private Information would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Classes described above, seeks the following relief:

a.     An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining

the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class herein;

b. Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d. An order instructing Defendants to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

e. An order requiring Defendants to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f. A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g. An award of such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all triable issues.

Dated: February 5, 2026                            Respectfully submitted,

                                    By: _Jeff Ostrow_____
                                        Jeff Ostrow
                                        **KOPELOWITZ OSTROW P.A.**
                                        One West Las Olas Blvd., Suite 500
                                        Fort Lauderdale, FL 33301
                                        (954) 525-4100
                                        ostrow@kolawyers.com

                                        Andrew W. Ferich (*pro hac vice* forthcoming)
                                        Brian J. Devall (*pro hac vice* forthcoming)
                                        **AHDOOT & WOLFSON, PC**
                                        201 King of Prussia Road, Suite 650
                                        Radnor, PA 19087
                                        (310) 474-9111
                                        aferich@ahdootwolfson.com
                                        bdevall@ahdootwolfson.com

                                        *Attorneys for Plaintiff and the*
                                        *Putative Class*